**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE MORGAN STANLEY SMITH BARNEY LLC WAGE AND HOUR LITIGATION<br><br>**MDL 2280** | Civ. No. 11-cv-3121 (WJM)<br><br><br>**OPINION** |

This multidistrict litigation consists of three putative wage and hour class actions, as well as a putative collective action under the Fair Labors Standards Act, against Defendants Morgan Stanley Smith Barney LLC and Morgan Stanley & Co., Inc. (together, "MSSB"). This matter comes before the Court on two motions: (1) Plaintiffs' motion for the certification of three class actions and (2) Plaintiffs' motion for conditional certification of the collective action. For the following reasons, the Court will **DENY** both motions.

## I.   BACKGROUND

Defendant MSSB is a limited liability company organized under the laws of Delaware with its corporate headquarters in New York. Third Am. Consol. Class Action Compl. (hereinafter, "Complaint") at ¶ 18. "MSSB offers a wide variety of financial products and provides financial services to a large and diversified group of clients…." *Id*. at ¶ 19. MSSB's business focuses on financial advisory services and the sale of various financial investment products. *Id*.

The named Plaintiffs in this case are Jimmy Kuhn, Nick Pontilena, Howard Rosenblatt, and Denise Outten. Each of those individuals worked for MSSB as Financial Advisors ("FAs"). Specifically, Pontilena and Otten worked at MSSB branches located in New Jersey; Rosenblatt worked at a branch in Connecticut; and Kuhn worked at a branch in New York. *Id*. at ¶¶ 11-15. According to Plaintiffs, these individuals worked in "Covered Positions" for MSSB, meaning they worked as FAs "who are or were: (1) employed by [MSSB] in the United States (including the District of Columbia and Puerto Rico) on a commission or salary basis, and to whom [MSSB] failed to pay overtime for work performed in excess of 40 hours per week as required by laws; and/or (ii) were unlawfully compelled to pay for [MSSB's] business expenses." *Id*. at ¶ 2.

At bottom, Plaintiffs allege that they and other "Covered Persons" were non-exempt employees entitled to overtime compensation under state and federal wage and hour laws for work performed in excess of 40 hours per week. Plaintiffs further allege that MSSB improperly categorized them as exempt employees in order to avoid paying overtime

compensation.   Accordingly, Plaintiffs seek to represent the following classes in three separate class actions alleging violations of state wage and hour laws:

1.  A "New York Class" that consists of all individuals, employed by MSSB in Covered Positions in the State of New York at any time since April 21, 2008

2.  A "New Jersey Class" that consists of all individuals, employed by MSSB in Covered Positions in the State of New Jersey since April 21, 2008

3.  A "Connecticut Class" that consists of all individuals, employed by MSSB in Covered Positions in the State of Connecticut at any time since April 21, 2008

*Id*. at 3. Plaintiffs also seek to represent the following collective group as part of a collective action alleging violations of the Fair Labor Standards Act ("FLSA")

1.  A "Federal Collective Group" that consists of all individuals who were or are employed by MSSB in Covered Positions in the United States of America, including the District of Columbia and Puerto Rico, at any time from April 21, 2008, who timely opt-in to any such collective group

*Id*.  With respect to the New York Class, Plaintiffs allege that MSSB violated § 142-2.2 of the New York State Labor Department's Codes, Rules and Regulations.  *Id*. at ¶ 5.  With respect to the New Jersey Class, Plaintiffs accuse MSSB of violating New Jersey Statutes Annotated "(N.J.S.A.)" § 34:11-56a4.  *Id*. at ¶ 6.  For the Connecticut Class, Plaintiffs accuse MSSB of violating Connecticut General Statutes ("Conn. Gen. Stat.") § 31-60(a).  *Id*. at ¶ 7.  Finally, Plaintiffs accuse MSSB of violating 29 U.S.C. § 207(a).  *Id*. at ¶ 4.  As a result, Plaintiffs contend, they and those they seek to represent have been illegally undercompensated for their work.  *Id*. at ¶ 8.

After entering into a joint discovery plan, the parties engaged in discovery on class and collective certification issues.  *See* ECF No. 81.  After class discovery ended, Plaintiffs filed the instant motions.  *See* ECF Nos. 124 and 125.

Generally speaking, Plaintiffs argue that the FAs at MSSB are salespeople that are nonexempt from overtime requirements set forth in state and federal wage and hour laws. Mot. for Class Cert. at 3.  However, Plaintiffs contend, MSSB employs a nationwide policy that deems its FAs exempt from overtime requirements.  *See id*.  In support of their position, Plaintiffs point to a number of factors which, in their view, demonstrate that FAs are uniformly treated such that class certification and conditional certification are appropriate. *See id*. at 3-8.  The Court will discuss those factors in greater detail when assessing the merits of Plaintiffs' motions.  However, for the purposes of this background discussion, Plaintiffs primarily raise the following arguments:

- FAs regularly engages in "cold calling," which involves making calls to potential customers in an attempt to sell MSSB's financial products

- FAs regularly attend networking and seminars in order to augment MSSB's retail customer base

- Internal documents show that MSSB considers FAs to be a core component of its retail business

- FAs are paid based on their ability to generate sales

- FAs are heavily supervised and therefore lack discretion over matters of significance

- FAs have no role in the managerial decisions affecting MSSB's overall business

- FAs regularly work in excess of 40 hours per week

*See id.* Unsurprisingly, MSSB disagrees with Plaintiffs' blanket description of an FA's role. Generally, MSSB argues that the roles of FAs vary significantly and therefore class and collective certification would be inappropriate. *See* ECF Nos. 133 and 134. Having set forth the general case background, the Court now turns to the merits of Plaintiffs' motions.

## II.    MOTION FOR CLASS CERTFICATION

Under Federal Rule of Civil Procedure 23(a), a class may be certified only where (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These are known as the numerosity, commonality, typicality, and adequacy requirements. *See In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009). In addition to fulfilling the requirements of Rule 23(a), a plaintiff must also meet one of the requirements set forth in Rule 23(b). *Id.* The requirement at issue here comes from Rule 23(b)(3), which permits certification only if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The twin requirements of Rule 23(b)(3) are known as predominance and superiority." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (footnote and quotation marks omitted). Each Rule 23 requirement must be established by a preponderance of the evidence. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015). While the class certification analysis may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011), merits questions may be considered only to the extent that they are relevant to determining whether Rule 23 prerequisites have been met. *See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S.Ct. 1184, 1195 (2013) (internal citations omitted).

        a.  Numerosity

The numerosity requirement has been met here. "To be certified, a class must be large enough in number to ensure that, for efficiency purposes, a class does not subject the defendants to multiple, similar lawsuits." *Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 242 (D.N.J. 2008) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 309 (3d Cir. 1998)). The numerosity requirement does not impose a bare minimum number of plaintiffs, however "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). Here, there are hundreds of members who fall within the proposed classes. Consequently, the numerosity requirement is satisfied.

        b.  Commonality

The commonality requirement is met if there are "questions of law or fact similar to the class." *Newton*, 259 F.3d 154, 182 (quoting Fed.R.Civ.P. 23(a)(2)). "'The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" *In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998) (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). The "threshold of commonality is not high." *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (internal citations omitted).

Here, the commonality requirement has been met. All individuals within the proposed classes are subject to MSSB's uniform policy of classifying its employees as exempt. Additionally, this litigation raises the common question of whether MSSB FAs are improperly classified. While MSSB contends that the varying functions performed by FAs preclude a finding of commonality, the Court concludes that those concerns are more appropriately addressed in the context of the predominance requirement under Rule 23(b)(3). *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001) ("Unlike commonality, predominance is significantly more demanding,

4

requiring more than a common claim." (citing *Amchem Prods, Inc. v. Windsor*, 521 U.S. 523, 623-24 (1997)).  Plaintiffs have therefore established commonality.

> ### c.  Typicality and Adequacy

While the numerosity and commonality requirements have been met, Plaintiffs have failed to establish typicality or adequacy by a preponderance of the evidence.  "Typicality entails an inquiry whether the named [plaintiffs'] individual circumstances are markedly different … or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988) (internal quotations and citations omitted).  Therefore, typicality may be satisfied where the plaintiff's claims "'arise [ ] from the same … practice or course of conduct that gives rise to the claims of the class members,' and are based on the same legal theory." *Bright v. Asset Acceptance*, LLC, 292 F.R.D. 190, 200 (D.N.J. 2013) (citing *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006)).  Adequacy, on the other hand, concerns "whether the named plaintiffs have the ability and incentive to vigorously represent the claims of the class." *In re Community Bank of Northern Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015) (citing *In re Community Bank of Northern Virginia*, 522 F.3d 275, 291 (3d Cir. 2010)).  "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Id.* (citing *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012)).

Here, MSSB emphasizes that many FAs have executed releases of claims that preclude participation in this litigation.  For example, certain FAs who fall within the proposed classes entered into Former Advisor Program Agreements ("FAP Agreements") upon leaving MSSB.  See Pergamo Dec. at ¶ 3.  The FAP Agreements contain a release of claims, including wage and hour claims.  *See id.*, Ex. A, at. 8.  At trial, MSSB would undoubtedly contend that those class members have waived their right to recover from this action. Courts have declined to find typicality where the named plaintiffs did not execute releases that were executed by other proposed class members.  *See, e.g., Melong v. Micronesian Claims Comm'n*, 643 F.2d 10, 13 (D.C. Cir. 1980) ("proposed class members who have executed releases cannot be represented by individuals who have not executed a release"); *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 317-18 (S.D.N.Y. 2003) ("Plaintiffs have not shown that their claims are typical of the claims of a Class consisting of numerous members who signed General Releases….")  Similarly, the existence of the FAP Agreements also preclude a finding of adequacy because it is unclear as to how the class representatives would challenge releases they did not sign.  *See Stewart v. Avon Prods, Inc.*, Civ.No. 98-4135, 1999 WL 1038338, *4 (E.D.Pa. Nov. 15, 1999) ("The most glaring potential conflict [precluding a finding of adequacy] here is between Plaintiff, who has not signed a release, and the overwhelming number of Class members who have."); *see also Melong*, 643 F.2d at 15 ("when the purported class representative has not executed a release and need not establish that the release is defective, serious questions are raised

concerning…the adequacy of [the class representative's] representation of the other class members.") The Court therefore finds that the typicality and adequacy requirements have not been met.

### d. Predominance – Rule 23(b)(3)

Even if Plaintiffs met the requirements of Rule 23(a), they have not established that they meet the requirements of Rule 23(b). In order to obtain class certification, Plaintiffs must show that they qualify under at least one subsection of Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(3), which provides that a class may be certified where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." While bearing some similarity to the commonality requirement of Rule 23(a), the predominance test presents a "far more demanding" standard. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310-11. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Id*. at 311 (quoting *Newton*, 259 F.3d at 172). Accordingly, Plaintiffs must demonstrate that their claims are "capable of proof through evidence that is common to the class rather than individual to its members." *Id*. at 311-12. As the Supreme Court has recently stated, "Rule 23(b)(3), as an adventuresome innovation, is designed for situations in which class-action treatment is not as clearly called for." *Comcast v. Behrend*, 133 S.Ct. 1426, 1432 (2013). For the reasons below, the Court concludes that common questions do not predominate and therefore class certification would be inappropriate.

Before explaining why common issues do not predominate, the Court will briefly explain what Plaintiffs must prove to prevail at trial. *See Adam v. Cardo Windows, Inc.*, 299 F.R.D. 68, 84 (D.N.J. 2014) (predominance inquiry may depend on the test applicable to potential class members' employment status). As noted in the background discussion, Plaintiffs seek the certification of three classes, all of which allege violations of state wage and hour laws. Specifically, Plaintiffs intend to prove that they are entitled to overtime pay because they are nonexempt employees under the following statutes: § 142-2.2 of the New York State Labor Department's Codes, Rules and Regulations; N.J.S.A. § 34:11-56a4; and Conn. Gen. Stat. § 31-60(a). In order to prevail, Plaintiffs will need to demonstrate that FAs are not exempt from those statutes' overtime requirements. The parties agree that the exemption rules under those statutes do not materially differ from the exemption requirements under the FLSA. Pls.' Mot. at 13; Defs.' Opp. at 17 n. 21. The FLSA's overtime requirements do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1). Of particular

6

importance here is the FLSA's administrative exemption.[1]  The administrative exemption applies to any employee:

> (1) Compensated on a salary or fee basis of not less than $455 per week … exclusive of board, lodging or other facilities
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  With respect to financial services employees in particular, the Department of Labor offers the following regulation:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

29 C.F.R. § 541.203(b).  When determining whether the administrative exemption applies, the Court must be mindful that exemptions under the FLSA are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991) (quoting *Arnold v. Ben Kanowsky*, Inc. 361 U.S. 388, 392 (1960)).  Additionally, the employer has the burden of establishing that an exemption applies. *See, e.g., Davis v. Mountaire Farms, Inc.*, 453 F.3d 554, 556 (3d Cir. 2006).

Unsurprisingly, determining whether an employee is exempt involves a fact intensive inquiry. *Morisky v. Public Service Elec. and Gas Co.*, 111 F.Supp.2d 493, 500 (D.N.J. 2012) ("the question of whether defendant improperly classified employees as exempt is unique to each employee and his or her particular job responsibilities"); *Ochoa v. Pearson Educ., Inc.*, Civ. No. 11-1382, 2012 WL 95340, *4 (D.N.J. Jan. 12, 2012) ("determination

---

[1] MSSB also argues that other exemptions may apply, including the highly compensated exemption and the professional exemption.  Defs.' Opp. at 33-36.

of whether an employer properly classified an employee is a highly fact specific inquiry"); *Donovan v. Public Policy Center of New Jersey*, Civ. No. 05-1181, 2006 WL 1373230, *8 (D.N.J. May 17, 2006) ("determination of whether the plaintiffs are exempt as professional or administrative employees is fact intensive and must be made on a case-by-case basis…"). Acknowledging that reality, a number of courts have declined to certify proposed classes of financial advisors who claim they were misclassified as exempt. *See, e.g., Alakozai v. Chase Investment Services Corp.*, Civ. No. 11-09178, 2014 WL 5660697 (C.D. Cal. Oct. 6, 2014) (denying certification of proposed class consisting of financial advisors because of dissimilarities within the proposed class); *Litty v. Merrill Lynch & Co, Inc.*, Civ. No. 14-0425, 2014 WL 5904907, at *2  (C.D. Cal. Aug. 4, 2014) (adjudication of exemption issue "will require individualized inquiries"); *Drake*, 2010 WL 2175819, *8 (extensive differences in the duties of financial advisors precluded class certification). *See also Tahir v. Avis*, Civ. No. 09-3495, 2011 WL 1327861, at *3 (D.N.J. Apr. 6, 2011). After reviewing the record, the Court similarly concludes that Plaintiffs' motion must be denied because common issues do not predominate.

In support of their motion for class certification, Plaintiffs rely on a number of internal MSSB documents, including MSSB policies governing the role and function of FAs. As a threshold matter, however, the relevant question is not solely focused on the substance of MSSB policies. Rather, the Court must consider the actual work performed by the proposed class members. *Alakozai*, 2014 WL 5660697, at *7 (citing *Rosenberg v. Renal Advantage, Inc.*, Civ. No. 11-2152, 2013 WL 3205426, *8 (S.D. Cal. June 24, 2013)). More importantly, many of the internal documents cited by Plaintiffs actually demonstrate that the roles among FAs vary considerably. For example, certain accounts are not subject to an MSSB policy that prohibits FAs from exercising discretionary trading authority. Liskow Decl., Ex. 9. Consequently, FAs who work with exempt accounts may exercise greater discretion than FAs who do not oversee such accounts. Moreover, internal MSSB documents indicate that some (but not all) FAs will hire staff to assist with their accounts. *See* Liskow Decl., Ex. 8. This is consistent with other portions of the record in which some FAs explain that they have assembled teams to manage client assets. *See, e.g.*, Gerson Decl. at ¶ 5 ("I am the founding partner of a FA team—Gerson Guarino & Meisel Group (GGM) at Morgan Stanley"). Similarly, the FA job descriptions relied upon by Plaintiffs militate against certifying the class. *See* Liskow Decl., Ex. 11. While sales may constitute part of an FA's role, the most salient takeaway from the job descriptions is that FAs may perform a wide range of functions, including advising clients based on their wealth management needs, developing marketing strategies, and conducting market research. *See id*. Therefore, internal MSSB documents do not support Plaintiffs' position; if anything, they demonstrate that individual issues predominate.

In connection with their argument that FAs are salespeople entitled to overtime pay, Plaintiffs contend that all FAs engage in cold calling. However, the record reveals that the role of cold calling is far more nuanced than Plaintiffs make it out to be. For example, Denise Otten testified that she was engaged in a high volume of cold calling early in her

career, but that the cold calling portion of her job began to wane as she gained more experience. *See* Otten Dep. at 118:15-18. Similarly, Howard Rosenblatt testified that after developing an established client base, his cold calling activities declined significantly. *See* Rosenblatt Dep. at 67:9-18. Mr. Rosenblatt also indicated that cold calling became more "taboo" after government agencies began cracking down on the practice. *See id*. at 67:22-25. In fact, Mr. Rosenblatt flat-out conceded that some FAs engaged in cold calling, while others did not. *Id*. at 68:19-21 (Q: "[S]ome did and some didn't do cold calling?" A: "Some did and some didn't.")

Setting aside the narrow issue of cold calling, it is similarly apparent that different FAs spent different amounts of time generating sales. Ms. Otten testified that as her career progressed and her book of business grew, she spent more time monitoring accounts as opposed to making sales. *See* Otten Dep. at 76:22-77:23. Nicholas Pontilena testified that as his client relationships became more established, he spent more time discussing general client goals and expectations. *See* Pontilena Dep. at 35:20-36:3. Mr. Pontilena additionally testified that as he gained new clients, he would continually monitor their portfolios to ensure they were positioned in a way to meet their needs. *See id*. at 40:2-10. Moreover, while Mr. Rosenblatt did pitch financial products to clients, he also testified that he spent approximately 30% of his time conducting market research, which is just one type of activity not involving sales. *See* Rosenblatt Dep. at 100:4-10.

Indeed, the varying fee structures affecting FA compensation further show that sales activity was not uniform. "Fee-based accounts," for example, do not impose transactional costs, meaning FAs are compensated based on the amount of assets in the account, not the amount of times orders or trades are executed. *See* Parlmerini Decl. at ¶ 7. FAs who primarily deal in fee-based accounts would be distinguishable from those who primarily deal in transaction-based accounts, with the latter involving a more commission-based incentive structure indicative of a sales position. In light of this type of evidence, it is apparent that not all FAs engaged in the same volume of sales activity. Accordingly, individual issues predominate.

Additionally, FAs work with a wide variety of clients, which may also impact whether the exemption applies. For example, some FAs assist small businesses and other organizations with their asset management and investment strategies. *See, e.g.,* Franklin Decl. at ¶ 6 ("In addition to individual clients, my team also has business clients, a foundational client, and a publicly-traded client. My team assists these clients in making financial decisions that affect how they operate their businesses."); Brown Decl. at ¶ 16 ("My corporate clients consist of a 401(k) and retirement plans for employers.")[2] This is

---

[2] In connection with opposing Plaintiffs' motion for class certification, MSSB has submitted a number of "happy camper" declarations from current employees. Plaintiffs urge the Court to disregard those declarations because they are tainted with the potential of coercion and are in no way representative of the class. Plaintiffs' position is untenable for a number of reasons. First,

of particular importance because under DOL regulations, an employee may qualify for the administrative exemption if his or her work directly relates to the management or general business operations of the employer or the employer's customers.   29 C.F.R. § 541.203(b). While some FAs work extensively with small businesses who were also MSSB customers, other FAs focus solely on individual clients whose investments were personal and not related to any business operations.  Again, the varying roles and business approaches of FAs preclude a finding that Plaintiffs have met their burden of establishing predominance under Rule 23(b)(3).

Moreover, the extent to which FAs are supervised varies greatly.  The record shows that some managers are very involved in the day-to-day lives of their FAs, while other managers are more hands off in their approach.  For example, Ms. Otten testified that her second manager had an "open-door policy" and would interact with his FAs at least once a week.  Ms. Otten further remarked that the second manager's style and demeanor differed significantly from that of her previous manager, who was less of a "people person" and who "most people couldn't get along with…." Otten Dep. at 157:20-158:16.  Further, other FAs have stated that they interact with their managers on a very limited basis. *See, e.g.*, Brown Decl. at ¶ 18 ("My branch manager has a very hands off style.  I go to him as a resource as needed, but I do not need to get his approval on my day-to-day activities….").  Similarly, while some FAs have had their trades reversed for being unsuitable to the customer's needs, others went their entire careers at MSSB without a reversal. *See, e.g.*, Pontilena Dep. at 111:7-24; Rosenblatt Dep. at 150:11-13; Kuhn Dep. at 115:6-13. Consequently, FAs have enjoyed varying degrees of autonomy and discretion during their MSSB tenures.  It would therefore be impossible to resolve their claims on a class-wide basis.

Plaintiffs other arguments for certification are unavailing.  Specifically, Plaintiffs rely heavily on DOL Administrator's Interpretation No. 2010-1 ("the Interpretation").  The Interpretation, which applies to employees who perform the typical job duties of a mortgage loan officer, concludes that those employees do not qualify for the administrative exemption.  According to the Interpretation, the typical mortgage loan officer gathers

---

the declarants have sworn to their statements under the penalty of perjury, and it is unclear as to why they would have a greater proclivity to be dishonest than the proposed class representatives. *See Faust v. Comcast Cable Commc'ns*, Civ. No. 10-2336, 2014 WL 3534008, at *12 n. 13 (D. Md. July 15, 2014).  Second, Plaintiffs were aware of MSSB's intention to file declarations since last November, but did not request to depose the declarants until September 2015.  As U.S. Magistrate Judge Steven Mannion noted, Plaintiffs had an opportunity to obtain testimony from the declarants prior to the close of discovery, but failed to do so. *See* Hearing Before U.S.M.J. Steven Mannion, September 15, 2015, ECF No. 129, Hr'g Tr. at 19.  Third, and perhaps most importantly, the majority of evidence militating against class certification comes from the class representative's own testimony, not the declarations Plaintiffs seek to have disregarded. *See Faust*, 2014 WL 3534008 at *12 n. 13.

financial information from a customer, enters that information into an algorithm designed to identify loan products, assesses the loan products, and then discusses the identified loan products with the customer. *See* DOL Admin. Interp. No. 2010-1 at 1-2. Plaintiffs' reliance on the Interpretation is misplaced. First, the relevance of the Interpretation to this case is glaringly dubious because FAs are not mortgage loan officers. In fact, the Interpretation even goes so far as to state that "financial consultants" may be exempt while mortgage loan officers are not. *See id*. at 7 (citing 29 C.F.R. § 541.201(c)). Second, the evidence on record merely shows that some FAs may perform the type of rote activities described in the Interpretation. That does not mean that all FAs perform those activities such that class certification would be appropriate. Simply put, the Interpretation does not resuscitate Plaintiffs' push for certification.[3]

FAs vary in how often they sell financial products; they differ in how they are supervised; they possess different types of clients; and they exercise varying degrees of autonomy. Therefore, on balance, the Court concludes that Plaintiffs have not met their burden for establishing predominance. Consequently, their motion for class certification is **DENIED**.

## III.   MOTION FOR CONDITIONAL CERTIFICATION OF THE COLLECTIVE ACTION

The FLSA provides employees with the ability to bring a "collective action" on behalf of themselves and similarly situated employees. See 29 U.S.C. § 216(b). Courts approach collective action certification under the FLSA by engaging in a two-step process. The first step is deciding whether to grant "conditional certification" – the type of certification at issue here. "'[C]onditional certification' is not really certification." *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) (internal quotations and citations omitted). Rather, the first step involves "the district court's exercise of [its] discretionary power … to facilitate the sending of notice to potential class members." *Id*. (international quotations and citations omitted). The second step is deciding whether to grant final certification. *See id*.

At the first step, courts apply a "fairly lenient standard" when determining whether the plaintiff has met the "modest factual showing" required for certification. *Zavala*, 691 F.3d at 536 n.4. Courts impose a stricter standard for class certification than they do for

---

[3] Plaintiffs' reliance on *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896 (3d Cir. 1991) is similarly without merit. That case involved individuals who sold electrical products on behalf of their employer. The court concluded that those individuals were not exempt because their "primary responsibility" was to produce sales, and the job functions relied upon by the defendant in support of an exemption were "'part and parcel' of the activity of 'producing sales.'" 940 F.2d at 904-05. For reasons already explained, the record shows that not all FAs were primarily responsible for sales. *See also Hein v. PNC Fin. Servs. Grp.*, Inc., 511 F.Supp.2d 563, 572 (E.D.Pa. 2007) (primary duty of financial advisor bringing FLSA action was not sales).

conditional certification.  *See Morisky v. Public Service Elec. and Gas Co.*, 111 F.Supp.2d 493, 497 (D.N.J. 2000).  However, conditional certification is warranted only where the plaintiff is able to "produce some evidence beyond pure speculation of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees."  *Id.* (internal quotation marks omitted) (quoting *Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011)).

At bottom, Plaintiffs argue that they have met this fairly lenient standard simply because MSSB has a uniform policy of treating all FAs as exempt under the FLSA. However, in light of the substantial evidence on the record, it is apparent that those policies affect different FAs in vastly different ways.  *See* Section 3.d, *supra*; *see also Mike v. Safeco Ins. Co. of America*, 274 F.Supp.2d 216, 221 (D.Conn. 2003) (allegations of a uniform classification policy is not by itself sufficient to warrant conditional certification). Consequently, any argument that a factual nexus exists between FAs would be based on nothing more than rank speculation.  *Evancho v. Sanofi-Aventis U.S. Inc.*, Civ. No. 07-2266, 2007 WL 4546100 (D.N.J. Dec. 19, 2007) is instructive.  The plaintiffs in that case moved to conditionally certify a class of pharmaceutical representatives who claimed, among other things, that they were entitled to overtime pay under the FLSA.  In denying the motion, the court acknowledged that the plaintiffs' burden was not particularly high, but nonetheless found that the roles of the pharmaceutical representatives varied so greatly that conditional certification would not be appropriate.  As explained already, the roles of FAs are similarly varied.  Moreover, the case against conditional certification is even greater here than it was in *Evancho*, where "little discovery" had taken place. 2007 WL 4546100, at *4.  Here, the Court has the benefit of reviewing a record significantly developed by the class discovery process, which has included the taking of multiple depositions and the production of voluminous amounts of MSSB documents.[4]  Plaintiffs cannot avoid that record simply by noting that the requirements for conditional certification are fairly lenient.   Even operating within that permissive framework, Plaintiffs have failed to meet their burden for conditional certification.  *See Litty*, 2014 WL 5904907, at *10 (denying conditional certification motion brought by financial advisors because evidence obtained through class discovery made clear that the roles of those advisors varied significantly).  Consequently, the motion for conditional certification is **DENIED**.

---

[4] The Court is aware of *Cohen v. Gerson Lehrman Group, Inc.*, 686 F.Supp.2d 317 (S.D.N.Y. 2010), a decision in which the district court declined to follow *Evancho*.  However, the motion for conditional certification in *Gerson* occurred at a motion to dismiss stage in which little to no discovery had taken place.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs' motions for class certification and conditional collective certification are **DENIED**.  An appropriate order accompanies this decision.


                           /s/ William J. Martini
                        **WILLIAM J. MARTINI, U.S.D.J.**

**Date: April 11, 2016**