UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE:  MORGAN STANLEY SMITH BARNEY LLC WAGE AND HOUR LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Case No. 11-3121 (WJM/SCM)<br><br>MDL 2280<br><br>Motion Date: November 21, 2016<br>Judge: Hon. William J. Martini<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

<b>Page</b>

I.     INTRODUCTION ........................................................................1

II.    STATEMENT OF UNDISPUTED FACTS........................................3

    A.     Plaintiffs Are Trained And Licensed Professionals Required By MSSB And Regulators To Provide Investment Advice Customized For Each Particular Client................................................3

    B.     Plaintiffs' Job Duties As Financial Advisors ......................................5

    C.     Plaintiffs Were Well-Compensated ....................................................6

III.   PROCEDURAL HISTORY ...........................................................6

IV.    MSSB IS ENTITLED TO SUMMARY JUDGMENT ................................8

    A.     Standard for Summary Judgment........................................................8

    B.     As A Matter of Law, Plaintiffs' FLSA Claims Fail Because Plaintiffs Satisfied The Requirements Of The Administrative Exemption ..........................................................................................9

        1.     Plaintiffs Were Compensated On A Salary Basis....................10

        2.     Plaintiffs Performed the Duties Required For The Administrative Exemption .......................................................10

            a.     Plaintiffs Collected and Analyzed Information Regarding Their Clients' Income, Assets, Investments or Debts ........................................................14

            b.     Plaintiffs Determined Which Financial Products Best Met the Customer's Needs and Financial Circumstances...............................................................16

            c.     Plaintiffs Advised Their Customers Regarding the Advantages and Disadvantages of Different Financial Products ............................................................18

            d.     Plaintiffs Marketed, Serviced and Promoted MSSB's Financial Solutions...........................................20

            e.     Plaintiffs Spent Minimal Time Executing Trades.........23

        3.     Plaintiffs Exercised Independent Judgment And Discretion ................................................................................24

# TABLE OF CONTENTS
### (continued)

**Page**

C.   Otten, Pontilena, and Kuhn's FLSA Claims Also Fail Because They Were Exempt Under the Highly Compensated Exemption ......26

D.   Pontilena and Kuhn's FLSA Claims Fail Because They Are Untimely .............................................................................28

E.   MSSB Is Entitled To Summary Judgment On Plaintiffs' State Law Claims.............................................................................29

V.   CONCLUSION.............................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adami v. Cardo Windows,*
2015 WL 1471844 (D.N.J. Jan. 29, 2014)....................................................28, 29

*Allen v. Coil Tubing Servs., L.L.C.,*
846 F. Supp. 2d 678 (S.D. Tex. 2012)..............................................................27

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..............................................................................................8

*Arasimowicz v. All Panel Sys., LLC,*
948 F. Supp. 2d 211 (D. Conn. 2013)..............................................................29

*Ashton v. Whitman,*
94 Fed. Appx. 896 (3d Cir. 2004)......................................................................9

*Auer v. Robbins,*
519 U.S. 452 (1997)............................................................................................13

*Bachrach v. Chase Inv. Servs. Corp.,*
No. CIV. 06-2785 (WJM), 2007 WL 3244186 (D.N.J. Nov. 1,
2007) ...............................................................................................................14, 29

*Baum v. Astrazeneca,*
372 F. App'x 246 (3d Cir. 2010) .......................................................................25

*Bellone v. Kraft Power Corp.,*
2016 WL 2992126 (E.D.N.Y. May 23, 2016)..................................................26

*De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP,*
792 F. Supp. 2d 812 (E.D. Pa. 2011)..................................................................8

*F.T.C. v. Wyndham Worldwide Corp.,*
799 F.3d 236 (3d Cir. 2015) ..............................................................................13

*In re Farmers Ins. Exchange, Claims Reps. Overtime Pay Litig.,*
481 F.3d 1119 (9th Cir. 2006) ...........................................................................13

OHSUSA:765699475.5

*Grondecki v. Axiom Mgmt., Inc.*,
   158 F. Supp. 3d 345 (E.D. Pa. 2016)....................................................8

*Hein v. PNC Fin. Servs.*,
   511 F. Supp. 2d 563 (E.D. Pa. 2007)............................................1, 14

*Icicle Seafoods, Inc. v. Worthington*,
   475 U.S. 709 (1986).........................................................................9

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
   560 F.3d 156 (3d Cir. 2009) .............................................................8

*Matysiak v. Shamas*,
   No. 3:10-CV-01841-GWC, 2015 WL 4939793 (D. Conn. Aug. 17,
   2015) ............................................................................................30

*Mitchell v. C & S Wholesale Grocers, Inc.*,
   No. CIV.A. 10-2354 (JLL), 2010 WL 2735655 (D.N.J. July 8,
   2010) ............................................................................................30

*Ochoa v. Pearson Educ., Inc.*,
   2012 WL 95340 (D.N.J. Jan. 12, 2012)............................................28

*Reiseck v. Universal Communs. of Miami, Inc.*,
   591 F.3d 101 (2d Cir. 2010) ............................................................29

*Resch v. Krapf's Coaches, Inc.*,
   785 F.3d 869 (3d Cir. 2015) .............................................................9

*Sarviss v. Gen. Dynamics Info. Tech., Inc.*,
   663 F. Supp. 2d 883 (C.D. Cal. 2009) ..............................................27

*Smith v. Johnson & Johnson*,
   2008 WL 5427802 (D.N.J. Dec. 30, 2008) *aff'd*, 593 F.3d 280 (3d
   Cir. 2010) .....................................................................................25

*Tsyn v. Wells Fargo Advisors, LLC*,
   No. 14-CV-02552-LB, 2016 WL 612926 (N.D. Cal. Feb. 16, 2016) .........*passim*

*Turner v. Schering-Plough Corp.*,
   901 F.2d 335 (3d Cir. 1990) .............................................................8

OHSUSA:765699475.5

*Williams v. Borough of W. Chester*,
   891 F.2d 458 (3d Cir. 1989) ................................................................8

**State Cases**

*Marx v. Friendly Ice Cream Corp.*,
   882 A.2d 374 (N.J. Super. Ct. App. Div. 2005) .................................29

**Statutes**

29 U.S.C. § 255(a) ................................................................................28

N.J.A.C. § 12:56–7.2 ............................................................................29

N.J.S.A. § 34: 11–56a25.1 ....................................................................30

**Regulations**

29 C.F.R. § 541 *et seq.* ........................................................................29

29 C.F.R. § 541.200 ................................................................................9

29 C.F.R. § 541.201 ..............................................................................11

29 C.F.R. § 541.202 ..............................................................................24

29 C.F.R. § 541.203 ......................................................................*passim*

29 C.F.R. § 541.207 ..............................................................................11

29 C.F.R. § 541.601 ........................................................................26, 27

29 C.F.R. § 541.700 ..............................................................................10

14 Fed. Reg. 7730 (Dec. 28, 1949) ......................................................10

OHSUSA:765699475.5

## I.   __INTRODUCTION__

Plaintiffs Nick Pontilena, Denise Otten, Jimmy Kuhn, and Howard Rosenblatt are all former licensed Financial Advisors ("FA") of Defendants Morgan Stanley Smith Barney LLC and Morgan Stanley & Co. Inc. (collectively "MSSB").  Plaintiffs assert claims that they were misclassified as exempt under the Fair Labor Standards Act ("FLSA") and the state laws of New Jersey, New York, and Connecticut, each of which parallels the FLSA.

The undisputed evidence, set forth in Plaintiff's own testimony, demonstrates that Plaintiffs met the requirements for the administrative exemption. Federal regulations have made clear for over 65 years that financial advisors perform duties that exempt them from overtime requirements.  The current version of the regulation provides that financial services employees, such as financial advisors, "generally meet the duties requirements for the administrative exemption," and lists several tasks deemed to be exempt.  29 C.F.R. § 541.203(b). The U.S. Department of Labor ("DOL") reconfirmed in an Opinion Letter that employees performing the duties of financial advisors are exempt from overtime. *See* DOL Op. Ltr. 11-27-2006.  Federal courts agree.  *See Tsyn v. Wells Fargo Advisors, LLC*, No. 14-CV-02552-LB, 2016 WL 612926, at *18 (N.D. Cal. Feb. 16, 2016) (granting summary judgment; financial advisors exempt as a matter of law); *Hein v. PNC Fin. Servs.*, 511 F. Supp. 2d 563 (E.D. Pa. 2007) (same).

OHSUSA:765699475.5

Here, Plaintiffs each testified that they performed all the duties that the governing regulation states makes them exempt employees.  Specifically, they: (1) collected and analyzed information regarding their clients' income, assets, investments or debts; (2) determined which financial products best met the customer's needs and financial circumstances; (3) advised their clients regarding the advantages and disadvantages of different financial products; and (4) marketed, serviced, and promoted MSSB's advisory services and financial products.  Indeed, Plaintiffs acknowledged that as registered representatives they were bound by the Financial Industry Regulatory Authority rules to engage in such exempt tasks.

Given Plaintiffs' testimony, the undisputed facts demonstrate that they were exempt under the administrative exemption under both the FLSA and the respective state laws.  For this reason alone, their claims fail in their entirety. Their claims are deficient as a matter of law for other reasons as well:  (1) Plaintiff Otten was exempt under the highly compensated exemption for the entire liability period and Plaintiffs Pontilena and Kuhn for a portion of the liability period; (2) Plaintiffs Pontilena and Kuhn's FLSA claims are time barred; and (3) both New Jersey Plaintiffs – Otten and Pontilena's – state law claims are time barred for the period before May 31, 2009 and June 13, 2009, respectively, and Plaintiff Rosenblatt's Connecticut state law claim is time barred for the period before June 29, 2009.

OHSUSA:765699475.5

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     Plaintiffs Are Trained And Licensed Professionals Required By MSSB And Regulators To Provide Investment Advice Customized For Each Particular Client

Denise Otten was employed by MSSB in New Jersey from July 2005 to August 2010; Nicholas Pontilena was employed in New Jersey from May 2003 to August 2009; Jimmy Kuhn was employed in New York from October 2002 to October 2009; and Howard Rosenblatt was employed in Connecticut from May 2000 to April 2010.  *See* Statement of Material Facts Not in Dispute ("SMF") 1.

MSSB is a financial services firm that through its Financial Advisors works with individuals, businesses, and institutions to recommend financial solutions that help build, preserve, and manage wealth.  FAs are responsible for advising clients regarding the client's financial decisions, for building and maintaining long-term client relationships, and for marketing and promoting MSSB's financial advisory services.[1]

FAs must be licensed by the Financial Industry Regulatory Authority ("FINRA").  To become licensed, FAs must pass qualification examinations administered by FINRA, which cover securities laws, SEC and FINRA rules, operation of financial markets, economic theory and risk, corporate financing, portfolio analysis, fair sales practices, and tax treatment of various investments.

---

[1] SMF 2–3, Declaration of Patrick Langone ("Langone Dec."), ¶ 3, 5.

OHSUSA:765699475.5

Maintaining the license requires on-going education and periodic testing.[2]

Each of the Plaintiffs maintained a FINRA Series 7 and 66 license, and some of them maintained additional FINRA licenses as well.  *See* SMF 7–10 (Langone Dec. ¶ 4); Pontilena Dep. 85:18–86:17 (Pontilena held a Series 31 license); Kuhn Dep. 99:3–18 (Kuhn held a Series 31 license); Rosenblatt Dep. 30:7–24; 48:12–22 (Rosenblatt held Series 31, 9, and 10 licenses).

The FINRA Rules require FAs to "conduct diligence into each individual client's financial situation in order to recommend only those securities that are suitable for the client's particular financial status, objectives, risk tolerance, tax exposure, and the like."  DOL Op. Ltr. 11-27-2006, p.1; *see also* FINRA Rule 2111(a) (requiring FAs to "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile.").  This is known as FINRA's "Suitability Rule."

FAs are also required to abide by the FINRA "Know Your Customer" Rule. *See* FINRA Rule 2090 (registered representatives are required to "use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority

---

[2] SMF 5, Langone Dec., ¶ 4.

OHSUSA:765699475.5

of each person acting on behalf of such customer"). In other words, as explained

further below, the FINRA Rules *require* FAs to engage in precisely the type of

tasks defined by the DOL as exempt administrative work.

MSSB expects and demands that its FAs comply with these regulatory

requirements,[3] and all the Plaintiffs testified that they consistently acted in

accordance with their regulatory obligations. SMF 11 (Otten Dep. 53:18–54:13;

Pontilena Dep. 33:25–34:4; Kuhn Dep. 66:14–67:18; Rosenblatt Dep. 82:6–18).

### B. Plaintiffs' Job Duties As Financial Advisors

Plaintiffs' deposition testimony provides the undisputed facts that establish

that they were correctly classified as exempt employees.

For example, and as explained in greater detail below, Otten testified that

she kept up on market developments; met with clients and collected information

regarding the client's income, assets, investments and debts; analyzed the

information to determine appropriate investments to recommend to clients; and

made recommendations based on a client's risk tolerance. SMF 12 (Otten Dep.

59:24–61:1; 54:22–58:22). Pontilena testified that he gathered client data

including their goals; analyzed and evaluated clients' financial status; identified the

needs of particular clients; developed and presented financial planning

recommendations and/or alternatives; monitored and reviewed accounts to ensure

---

[3] SMF 11, Langone Dec., ¶ 5.

the soundness of his recommendations; and interacted with other professionals depending on what he was trying to accomplish for the client.  SMF 13 (Pontilena Dep. 33:11–40:10).  Kuhn testified that he gathered client data; analyzed and evaluated his client's financial status; developed and presented financial planning recommendations; evaluated financial planning alternatives; presented his recommendations to his clients; and implemented his recommendations and monitored the status of those investments.  SMF 14 (Kuhn Dep. 69:5–73:15; 74:3–77:1).  Rosenblatt testified that he spent 20–30 percent of his time on research; provided customized financial advice for clients; collected and analyzed information from clients; and ascertained clients' goals and objectives.  SMF 15 (Rosenblatt Dep. 100:4–10).

### C.   Plaintiffs Were Well-Compensated



SMF 16 (Palmerini Dec. ¶ 9).

## III.   PROCEDURAL HISTORY

Kuhn filed his complaint in the Eastern District of New York on April 28, 2011; Pontilena filed his complaint in the District of New Jersey on May 31, 2011;

OHSUSA:765699475.5

Otten filed her complaint in the Eastern District of New York on June 13, 2011;

and Rosenblatt filed his complaint in the District of Connecticut on June 29, 2011.

Those actions were consolidated and transferred to this Court on December 16,

2011 (Dkt. No. 15).  The operative Consolidated Complaint (Dkt. No. 74) asserts

claims for overtime under the FLSA and the three states' laws for the period

commencing April 21, 2008.[4]

By Order dated April 11, 2016, the Court denied Plaintiffs' motions for class

and conditional certification of the overtime claims.  (Dkt. 146).  The Court found

that individual issues predominated and that Plaintiffs were not adequate or typical

representatives.  In that Order, the Court rejected many of the same arguments that

Plaintiffs rely on to support the merits of their claims (e.g., that every activity FAs

engage in can be reduced to "sales").  The Court cited specific examples of the

named Plaintiffs' deposition testimony that undermined Plaintiffs' theory of

liability.

Plaintiffs filed a Petition for Leave to Appeal the denial of class certification

on April 22, 2016.  The Third Circuit denied the Petition on May 20, 2016.

---

[4] The Consolidated Complaint also alleged claims of impermissible wage
deductions under state laws, but the Court dismissed those claims with prejudice
on May 20, 2014.  (Dkt. 76).  The Consolidated Complaint also asserted claims on
behalf of Plaintiff Robert Gibson, but his claims were voluntarily dismissed with
prejudice (Dkt. 150).  Hence, the sole claims remaining are the four Plaintiffs'
claims for overtime under the FLSA and state laws.

OHSUSA:765699475.5

## IV.    MSSB IS ENTITLED TO SUMMARY JUDGMENT

### A.    Standard for Summary Judgment

Rule 56 provides for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Conclusory testimony is insufficient to raise genuine issues of fact and defeat summary judgment.  *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment."); *Grondecki v. Axiom Mgmt., Inc.*, 158 F. Supp. 3d 345, 355 (E.D. Pa. 2016) ("The adverse party must raise 'more than a mere scintilla of evidence in its favor' in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.") (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)); *De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP*, 792 F. Supp. 2d 812, 820 (E.D. Pa. 2011) ("Conclusory

OHSUSA:765699475.5

statements or legal conclusions, even if characterized as disputes of fact, contained within a party's submissions are 'entirely insufficient' to create a genuine dispute and withstand a motion for summary judgment.") (quoting *Ashton v. Whitman*, 94 Fed. Appx. 896, 902 (3d Cir. 2004)).

In an FLSA overtime case, the duties that an employee performed is a question of fact; whether those duties render the employee exempt is a question of law. *Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 872 (3d Cir. 2015) ("Whether employees' 'particular activities excluded them from the overtime benefits of the FLSA is a question of law.'") (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

## B.     As A Matter of Law, Plaintiffs' FLSA Claims Fail Because Plaintiffs Satisfied The Requirements Of The Administrative Exemption

Under the governing regulations, to qualify as exempt under the administrative exemption, an employee must be one: "(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ; (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

OHSUSA:765699475.5

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).

### 1.    <u>Plaintiffs Were Compensated On A Salary Basis</u>



SMF 17 (Palmerini Dec. ¶ 8).  Thus, the undisputed evidence shows that the salary test is met.

### 2.    <u>Plaintiffs Performed the Duties Required For The Administrative Exemption</u>

In an unbroken line of authority spanning over 65 years, the DOL and federal courts have recognized that the work performed by financial advisors meets the duties requirement of the administrative exemption.  *See, e.g.*, 14 Fed. Reg.

---

[5] Although Plaintiffs have previously suggested that the salary test might not be satisfied because (according to Plaintiffs) "when a Financial Advisor's production was insufficient to justify a particular month's 'draw,' subsequent months commissions were effectively reduced to retroactively cover what was treated as unearned 'draw'" (Ps' Rule 23 Mot., p. 15, n. 5; Dkt. 124-1), they presented no competent evidence to support that statement.  As the undisputed, competent evidence demonstrates,                                       SMF 18 (Palmerini Dec. ¶¶ 4–5).  As recognized in the DOL Opinion Letter, a compensation system that provides incentive compensation only to the extent that it exceeds salary satisfies the salary basis test. DOL Op. Ltr. 11-27-2006, p. 3.

OHSUSA:765699475.5

7730 (Dec. 28, 1949) ("customers' brokers in stock exchange firms" perform work "directly related to management policies or general business operations" of their employers or their employers' customers); 29 C.F.R. §541.207(d)(2) (1973) (administrative exemption covers "the kind of discretion and independent judgment exercised by a customer's man in a brokerage house in deciding what recommendations to make to a customer for the purchase of securities").

The current regulations, adopted in 2004, provide that "employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example)" may be exempt under the administrative exemption.  29 C.F.R. §541.201(c).  In particular:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.  However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

29 C.F.R. § 541.203(b).  The duties identified in the first sentence, by definition, are exempt and do not constitute the non-exempt "selling" that is described in the second sentence.

Indeed, at the time this regulation was issued, the DOL "confirmed that employees who primarily engage in these exempt tasks satisfy both prongs of the administrative exemption's duty requirement: that is, they both perform work 'directly related to . . . management or general business operations' and exercise 'discretion and independent judgment' on 'matters of significance.'" *Tsyn*, 2016 WL 612926, at *2 (quoting *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 21,122, 22,146 (Apr. 23, 2004)).  Moreover, the DOL made clear that "many financial services employees qualify as exempt administrative employees, even if they are involved in some selling to customers." *Id.*

In a 2006 Opinion Letter, the DOL reaffirmed that financial advisors qualify for the administrative exemption where they "use their expertise and knowledge of the securities industry and markets to analyze and to interpret the client's investment objectives," "provide customized and individualized investment advice," and "engage in promotion and business development activities."  DOL Op. Ltr. 11-27-2006, p. 5.  In these circumstances, the DOL concluded, financial advisors perform "office or non-manual work directly related to the management or general business operations of the employer." *Id.*, p. 5.  Among other things, financial advisors "service their employer's financial services business by engaging in promotion and business development activities, including the

-12-

marketing, servicing, and promoting of the employing firm's financial services and products, and by making themselves visible to the appropriate segments of the public in order to meet and retain potential new clients for the employing firm." *Id.*, p. 5–6.  The fact that financial advisors "also bring about the purchase or sale of such investments for the clients and execute the actual transactions that result from their financial advice" does not make "sales" their primary duty nor render them non-exempt.  *Id.*, p. 4.

As Plaintiffs have acknowledged, "An agency's interpretation of its own regulation is controlling unless it is 'plainly erroneous or inconsistent with the regulation.'"  Ps' Rule 23 Mot. (Dkt. 124-1), p. 20 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *see also F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 251 (3d Cir. 2015) ("[W]here an agency interprets the meaning of its own regulation . . . courts typically must defer to the agency's reasonable interpretation."); *In re Farmers Ins. Exchange, Claims Reps. Overtime Pay Litig.*, 481 F.3d 1119, 1129 (9th Cir. 2006) (courts "must give deference to the DOL's interpretation of its own regulations through, for example, Opinion Letters.").

Given this regulatory authority, it is not surprising that federal courts have held that financial advisors are exempt from overtime requirements under the administrative exemption.  *See, e.g.*, *Tsyn*, 2016 WL 612926 (granting summary judgment; financial advisor exempt as a matter of law under the administrative

-13-

exemption); *Hein*, 511 F. Supp. 2d 563 (same); *cf. Bachrach v. Chase Inv. Servs. Corp.*, No. CIV. 06-2785 (WJM), 2007 WL 3244186, at *1, 3 (D.N.J. Nov. 1, 2007) ("With respect to the overtime claims, the law strongly suggests that [FAs] were not entitled to overtime"; "As an example of administrative employees, federal regulations list '[e]mployees in the financial services industry' whose duties include collecting information about customers' finances, preparing a financial plan for their customers, and ultimately selling the plan.  29 C.F.R. § 541.203 (2007).  This is precisely what the class members do.").

As set forth below, the undisputed evidence in this case establishes that Plaintiffs performed the duties that the regulations and caselaw define as exempt.

### a.  Plaintiffs Collected and Analyzed Information Regarding Their Clients' Income, Assets, Investments or Debts

Plaintiffs' deposition testimony demonstrates that their duties included "collecting and analyzing information regarding the customer's income, assets, investments or debts."  *See* 29 C.F.R. § 541.203(b).

Otten testified that every time she opened a new account she had a dialogue with the client to get to know their sophistication and knowledge of investments, their risk tolerance, their goals, and the entire financial picture for that client.  SMF 19 (Otten Dep. 56:11–57:9).  Otten admitted that "after [she] collect[ed] that information regarding [her] client's income, assets, investments, and debts, while

-14-

[she was] working at Morgan Stanley [she] analyze[d] that information in order to determine the appropriate investments to recommend to [her] clients." SMF 20 (Otten Dep. 54:22–55:3). She also admitted that she made "some determination as to their appropriate risk tolerance." SMF 21 (Otten Dep. 55:4–6).

Pontilena testified that once he established and defined a relationship with a client he gathered data about the client which included "interviewing or questioning the client about various aspects of his or her financial resources, obligations, and expectations," and he also "determine[d] the client's goals, needs, and priorities, assess[ed] the client's values and attitudes, and determine[d] the client's time horizons and risk tolerance" and "collect[ed] applicable client records and documents." SMF 22 (Pontilena Dep. 36:10–24). Pontilena also admitted that he "analyz[ed] and evaluat[ed] the client's financial status." SMF 23 (Pontilena Dep. 37:9–13).

Kuhn testified that he tried to gather "client data and analyz[e] and evaluat[e] the client's financial status . . . with regard to every client relationship." SMF 24 (Kuhn Dep. 69:9–22). Kuhn testified that he met with new clients to "gather their assets and . . . have some dialogue with them regarding their sophistication and knowledge of investments," and "have some dialogue with them regarding their risk tolerance," "financial goals," and that he would "try to consider

OHSUSA:765699475.5

their entire financial picture before [making] a recommendation."  SMF 25 (Kuhn

Dep. 70:6–71:7).

Rosenblatt testified that he obtained information about a client's "goals, their

financial situation or their risk tolerance" through the use of a written

questionnaire.  SMF 26 (Rosenblatt Dep. 81:8–13).  Rosenblatt explained the

importance of obtaining all that information about a client:

> [T]o use the 529 college saving example if their child is 15-years old
> the investment recommendations are going to be different than if their
> child is five.  As they are closer to college you want the investments
> to be more conservative because they don't have as much time in case
> the market pulls back for a recovery before they actually need to start
> paying tuiton.  Similar[ly] if someone is 30-years old they have more
> time to retire than if someone is 80-years old.  This is all information
> you want to capture to make a sound recommendation.

SMF 27 (Rosenblatt Dep. 81:14–82:2).  In addition to the questionnaire,

Rosenblatt also sat with clients and talked with them about their goals and

objectives and their financial status. SMF 28 (Rosenblatt Dep. 82:6–18).

### b. Plaintiffs Determined Which Financial Products Best Met the Customer's Needs and Financial Circumstances

Plaintiffs' deposition testimony demonstrates that their duties included

"determining which financial products best met the customer's needs and financial

circumstances." *See* 29 C.F.R. § 541.203(b).

Otten testified that after she gathered all the information she needed in order

to "Know Your Customer," she then "ma[de] some determination as to which

financial products best met the client's needs and circumstances." SMF 29 (Otten Dep. 57:10–15). In order to do this, she typically did an asset allocation for her clients and "based on their needs and their risk tolerance, [she] might suggest their age in bonds or fixed income." SMF 29 (Otten Dep. 57:10–15). She admitted that she always made a recommendation that she thought was in the best interests of her clients, and she did research "to stay abreast of the market and to determine which products [she] thought would be appropriate to recommend to clients." SMF 30  (Otten Dep. 58:14–22). She testified that she spent about an hour every day keeping abreast of developments in the securities markets and educating herself about various investment opportunities. SMF 31 (Otten Dep. 59:24–61:1).

Pontilena testified that he ensured that his "financial planning recommendations would meet the goals and objective of [his] client, reflect his or her values, situation, and risk tolerance." SMF 32 (Pontilena Dep. 38:7–17). He also testified that he kept abreast of developments in the market and new investment vehicles because he needed to know "what kinds of opportunities there were in the advantages and disadvantages of those various opportunities." SMF 33 (Pontilena Dep. 70:25–71:12).

Kuhn testified that "in the course of financial planning [he] would . . . determine which financial products best met [his] client's needs and circumstances." SMF 34 (Kuhn Dep. 66:5–9). In "identifying and evaluating

-17-

financial planning alternatives," Kuhn testified that he "would see what the client has, and whether it be complimenting [sic] their current investments, and presenting them with different alternative investments," and he would "see what their allocation is throughout the spectrum of stocks, bonds, real estate, and come to some type of conclusion."  SMF 35 (Kuhn Dep. 72:18–73:4).  Kuhn made the choice about which investment recommendations to make after personally researching the funds and investment products.  SMF 36 (Kuhn Dep. 72:18–73:4).

Rosenblatt testified that he "determine[d] what financial products [he] thought would be best to meet a particular client's needs and circumstances."  SMF 37 (Rosenblatt Dep. 102:3–6).  Rosenblatt admitted that "part of [his] job was to determine what were the appropriate financial products for a particular client based upon their financial situation, their risk tolerance, their goals and objectives."  SMF 38 (Rosenblatt Dep. 54:25–55:13).  For example, "health and life insurance may be appropriate for some clients but not for others," and it was his "job to determine if it was appropriate or not and make a recommendation."  *Id.*

### c.   Plaintiffs Advised Their Customers Regarding the Advantages and Disadvantages of Different Financial Products

Plaintiffs' deposition testimony demonstrates that their duties included "advising the customer regarding the advantages and disadvantages of different financial products." *See* 29 C.F.R. § 541.203(b).

-18-

Otten testified that she advised her clients on the pros and cons of various financial products and that after she determined what she was going to recommend to the client, she would have a conversation with the client to discuss the pros and cons of various financial products or strategies.  SMF 39 (Otten Dep. 63:19–64:10).

Pontilena testified that his duties included "presenting and reviewing the recommendations with the client, working with the client to ensure that the plan meets his or her goals and expectations, and revising the recommendations as necessary."  SMF 40 (Pontilena Dep. 38:18–23).

Kuhn testified that he "advise[d] [his] clients regarding the pros and cons of different financial products and the timing of financial transactions."  SMF 41 (Kuhn Dep. 66:10–13).  He also testified that "in order to advise [his] clients on the advantages and disadvantages of various investment opportunities, [he] had to understand those investment opportunities," and he "would read a lot of investment journals, Wall Street Journal, Barrons, Investors Business Daily.  [He] would also do research online."  SMF 42 (Kuhn Dep. 79:20–80:6).

Rosenblatt testified that he "advised clients on the advantages and disadvantages of different financial products."  SMF 43 (Rosenblatt Dep. 102:7–9).  Rosenblatt explained that "every client has different needs.  And based on their age, their risk tolerance, their net worth, their objective for the assets in question

-19-

we determine what to recommend."  SMF 44 (Rosenblatt Dep. 54:1–4).

Rosenblatt explained that he would feel out what a client wanted, and it was only

after he "explored the options and their needs and their interests" that he "came to

a point of a specific recommendation."  SMF 45 (Rosenblatt Dep. 106:5–22).

### d.   Plaintiffs Marketed, Serviced and Promoted MSSB's Financial Solutions

Plaintiffs' deposition testimony demonstrates that their duties included

"marketing, servicing, and promoting [MSSB's] financial products."  *See* 29 C.F.R.

§ 541.203(b).

Otten testified that she had an obligation to monitor a client's account to

ensure that it continued to meet the client's needs.  SMF 46 (Otten Dep. 78:15–24).

When asked how she ensured that her client accounts were adequately monitored

and maintained, Otten explained that she "just watched them carefully, because,

again I did not have a very large book of business. . . [and she] tried to have annual

meetings with [her] client in-house, and then if you needed to change anything,

you would."  SMF 47 (Otten Dep. 79:3–15).  As to her marketing and promotion

efforts, Otten testified that she spent 14 to 15 hours per week marketing to

potential clients through cold calling and warm calling (although as of April 2009

she was no longer cold calling).[6]  SMF 48 (Otten Dep. 108:18–109:22; 118:2–

---

[6] Otten explained what she meant by "warm calling": "I assumed warm calling was
calling people who were not your clients, but that you've met before, and –

OHSUSA:765699475.5

119:11).  Otten also testified that seminars were an effective marketing tool, and that she had client dinners once a year.  SMF 51 (Otten Dep. 120:22–24; 122:12–14).

Pontilena testified that he serviced existing accounts by monitoring them. SMF 52 (Pontilena Dep. 40:2–41:8).  He explained that "as a financial advisor, you're not supposed to just bring the client in and take care of the client.  It's an ongoing process, and you would do reviews and have review discussions and meeting with clients, and those meetings would result in . . . evaluating where you're at . . . if anything has changed."  SMF 53  (Pontilena Dep. 40:7–24).  As to marketing and promotion efforts, Pontilena testified that he was "responsible with developing [his] own marketing plan, and that marketing plan was a combination of cold calling, warm calling, mailers, seminars, warm market, networking, all of those things."  SMF 54 (Pontilena Dep. 48:16–49:2).  Pontilena explained that with his marketing plan he "wanted to be strategic and intelligent about it . . . [a]nd the plan was really just a persistence of pursuing all of those different avenues, but focusing on where I thought I had the most probability of success."  SMF 55 (Pontilena Dep. 49:5–13).

---

whether they were at seminars or what have you."  SMF 49 (Otten Dep. 108:23–109:3).  Pontilena explained the term similarly: "Warm calling is where you might know somebody, know who they are, but not ever approach them for business.  So, you call somebody that you know through someone or what have you, and you just, you know, try to get a business appointment from that . . . ."  SMF 50 (Pontilena Dep. 51:9–16).

OHSUSA:765699475.5

Kuhn testified that he had a continuing obligation, under the Know Your Customer Rule, to keep up to date on the client's financial status and goals, and he did so "[t]hrough speaking with the client on a weekly, monthly, quarterly basis." SMF 56 (Kuhn Dep. 71:8–72:12).  Kuhn also testified that after the crash in 2008 and "throughout my career at Morgan Stanley I always contacted my clients on a pretty frequent basis.  It was part of my service proposition when I first got them as a client."  SMF 57 (Kuhn Dep. 167:12–21).  As to his marketing and promotion efforts, Kuhn testified that he utilized cold calling (which was "higher earlier in the career than later in the career"), mailers, seminars, referrals, networking and community involvement to make himself visible to potential new clients.  SMF 58 (Kuhn Dep. 56:13–23; 81:4–86:2).

Regarding servicing accounts, Rosenblatt testified that "each client would have their own portfolio . . . [a]nd the portfolio needed constant management," and "if there were changes in market conditions or investment opportunities," he would need to speak to them about possible changes.  SMF 59 (Rosenblatt Dep. 86:11–88:8).  He also needed to communicate with "clients to determine whether or not their needs and interests had changed." SMF 60 (Rosenblatt Dep. 86:11–88:8).  In fact, Rosenblatt testified that in his last few years with MSSB managing client accounts involved the "[v]ast majority of the time."  SMF 61 (Rosenblatt Dep. 86:11–88:8).  As to marketing and promotion, Rosenblatt testified that "in order to

OHSUSA:765699475.5

develop a client base one of the things that you needed to do was to market

yourself to . . . prospects so that they could become your clients."  SMF 62

(Rosenblatt Dep. 63:14–18).  He "network[ed] as a part of [his] marketing to build

relationships and develop clients . . . [t]hrough different organizations."  SMF 63

(Rosenblatt Dep. 65:5–16).  He also marketed through "referrals . . . meals,

entertainment, seminars, cold calling pitches and proposals, partnering with

product specialists . . . [and] e-mail lists and e-mail pitches, proposals, market

updates to the list."  SMF 64 (Rosenblatt Dep. 82:19–83:5).  Although early in his

career he did cold calling, he admitted that "probably by 2003, 2004, I probably

had stopped cold calling at that point."  SMF 65 (Rosenblatt Dep. 67:9–68:2).

### e.  <u>Plaintiffs Spent Minimal Time Executing Trades</u>

Plaintiffs' testimony also establishes that they were not primarily engaged in

executing trades, which might be characterized as non-exempt "sales" activity.

Indeed, each Plaintiff testified that the amount of time they spent executing trades

was minimal.  *See* SMF 66 (Otten Dep. 159:13–160:14) (trade execution generally

took "10 to 15 minutes in a day," although annuities might take "a half an hour");

SMF 67 (Pontilena Dep. 75:6–76:14) (executing trades was usually a matter of

minutes); SMF 68 (Kuhn Dep. 86:16–87:11) (order execution took from five

minutes a day to an hour maximum); SMF 69 (Rosenblatt Dep. 113:5–9) ("[T]o

place a trade for a stock was a matter of seconds.").

-23-

### 3.   Plaintiffs Exercised Independent Judgment And Discretion

As Plaintiffs have acknowledged, the "discretion and independent judgment" standard means that the employees' duties involve the "comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," which must be analyzed "in light of all the facts involved in the particular employment situation."  Ps' Rule 23 Mot. (Dkt. 214), p. 16, *citing* 29 C.F.R. § 541.202 (a), (b).  The DOL Opinion Letter confirms that "licensed financial advisors who primarily do the sorts of tasks described in 29 C.F.R. §541.203(b) . . . by that very work 'exercise . . . discretion and independent judgment with respect to matters of significance' sufficient to 'satisf[y] this element of the administrative exemption.'" *Tsyn,* 2016 WL 612926 at *13 (quoting 2006 Op. Ltr. at 2, 5–6).

The undisputed evidence establishes that Plaintiffs' duties required the exercise of independent judgment and discretion.  Their primary duties included formulating and presenting financial recommendations to clients.  As Plaintiffs testified, they did not need or obtain approval from a manager to make and present their financial recommendations to clients in most circumstances.  SMF 72 (Pontilena Dep. 110:14–111:3); SMF 71 (Otten Dep. 152:25–153:5); SMF 73 (Rosenblatt Dep. 149:11–150:18); SMF 70 (Kuhn Dep. 114:14–115:5).  Rather, consistent with the regulatory requirements, they exercised their discretion and

OHSUSA:765699475.5

independent judgment in selecting a recommendation that was suitable for the particular client. As Plaintiffs testified, few or none of their trades was ever reversed by management. SMF 76 (Pontilena Dep. 111:4–24); SMF 75 (Otten Dep. 146:19–147:22); (Rosenblatt Dep. 150:11–13); SMF 74 (Kuhn Dep. 115:6–13). Furthermore, Pontilena and Otten testified that they did not even interact with their managers very often. Otten spoke to her manager once a week for 5–15 minutes, and Pontilena testified that he had only one substantive conversation with his branch manager in his entire MSSB tenure. SMF 78 (Otten Dep. 157:12–158:22); SMF 79 (Pontilena Dep. 109:11–110:13).

In prior briefing, Plaintiffs argued that they did not exercise independent judgment and discretion because, due to regulatory requirements, a person with a FINRA supervisory license reviewed certain communications and trading activity. Plaintiffs' argument was considered and rejected by the court in *Tysn*, 2016 WL 612926, at *13 (rejecting plaintiff financial advisors' argument that they did not exercise discretion and independent judgment because "they were supervised, could neither dictate nor deviate from corporate policy, and could recommend or sell only products that Wells Fargo has 'pre-approved'"); *see also Baum v. Astrazeneca*, 372 F. App'x 246, 249 n.7 (3d Cir. 2010) ("[E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."); *Smith v. Johnson & Johnson*, 2008 WL 5427802,

-25-

at *11 (D.N.J. Dec. 30, 2008) *aff'd*, 593 F.3d 280 (3d Cir. 2010) ("Simply because supervision and regulatory constraints exist, however, is not a reason for refusing to apply the administrative exemption.").

Accordingly, the undisputed evidence establishes that Plaintiffs were properly classified as exempt under the FLSA under the administrative exemption.

### C.   **Otten, Pontilena, and Kuhn's FLSA Claims Also Fail Because They Were Exempt Under the Highly Compensated Exemption**

The FLSA claims of Plaintiffs Otten, Pontilena, and Kuhn also fail, in whole or in part, for an independent reason:  they were exempt under the highly compensated exemption.  The highly compensated exemption applies where the employee earns total annual compensation of $100,000 and customarily and regularly performs at least one of the exempt duties or responsibilities of an exempt executive, administrative or professional employee.  29 C.F.R. § 541.601. "'A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties.'"  *Bellone v. Kraft Power Corp.*, 2016 WL 2992126, at *4 (E.D.N.Y. May 23, 2016) (quoting 29 C.F.R. § 541.601(c)).

OHSUSA:765699475.5



[7] SMF 16, 80 (Palmerini Dec. ¶¶ 8, 9). ██████

██████, SMF 17, 81–82 (Palmerini

Dec. ¶ 9); ██████████████████████████

██████

There is also no dispute that Otten, Pontilena, and Kuhn all customarily and
regularly performed at least one administratively exempt duty.  As explained
above, Plaintiffs testified that they regularly spent time collecting information
regarding clients' income, assets, investments and debts; analyzing the information
to determine appropriate investments to recommend to clients; making
determinations based on a client's risk tolerance; and marketing MSSB's products
and advisory services. These are all administratively exempt duties that Plaintiffs
customarily and regularly performed.

---

[7] ██████████████████████████████

██████ SMF 80 (Palmerini Dec. ¶ 9).  An employee who does not work a
full year for the employer, either because the employee is newly hired after the
beginning of the year or ends the employment before the end of the year, qualifies
for the highly compensated exemption if the employee receives a pro rata portion
of $100,000, based upon the number of weeks that the employee will be or has
been employed.  29 C.F.R. §541.601(b)(3); *see also Allen v. Coil Tubing Servs.,
L.L.C.*, 846 F. Supp. 2d 678, 711 (S.D. Tex. 2012); *Sarviss v. Gen. Dynamics Info.
Tech., Inc.*, 663 F. Supp. 2d 883, 892 (C.D. Cal. 2009) (employee met
compensation requirements where employee's average weekly compensation
would result in annual compensation in excess of $100,000).

OHSUSA:765699475.5

Accordingly, MSSB is entitled to summary judgment on Otten's FLSA claim in its entirety because she qualified for the highly compensated exemption every year during the liability period. MSSB is entitled to summary judgment on Pontilena and Kuhn's FLSA claims for 2008 by virtue of the highly compensated exemption.

### D. Pontilena and Kuhn's FLSA Claims Fail Because They Are Untimely

Pontilena and Kuhn's FLSA claims fail as a matter of law for another independent reason: their FLSA claims are time barred.

Pontilena did not file his FLSA opt-in and consent notice until February 7, 2014 (Dkt. 65) – more than four years after the termination of his employment in August 2009. Kuhn did not file his FLSA opt-in and consent notice until February 7, 2014 (Dkt. 63-1) – more than four years after the termination of his employment in October 2009. Therefore, Pontilena and Kuhn have no timely FLSA claims. *See* 29 U.S.C. § 255(a) (statute of limitations for FLSA claims is two years, or three years if the violation was willful); *Adami v. Cardo Windows*, 2015 WL 1471844, at *6 (D.N.J. Jan. 29, 2014) ("Courts in this District and Courts of Appeal have held that 29 U.S.C. § 256 means what it says: even for a named plaintiff in a collective action, the action is deemed commenced upon the filing of a written consent to join the collective action."); *Ochoa v. Pearson Educ., Inc.*, 2012 WL 95340, at *2 (D.N.J. Jan. 12, 2012) ("In the instance in which a written

-28-

consent is not filed concurrently with the complaint . . . the action is not considered commenced until the subsequent date on which the written consent is filed.").

Therefore, MSSB is also entitled to summary judgment as to Pontilena and Kuhn's FLSA claims because they are time barred.

### E. MSSB Is Entitled To Summary Judgment On Plaintiffs' State Law Claims

As Plaintiffs acknowledged in their motion for class certification, "the FLSA's administrative exemption does not materially differ from those of the state wage and hour laws of New York, New Jersey and Connecticut." Ps' Rule 23 Mot. (Dkt. 124-1), p. 13. *See also Adami*, 2014 WL 2586933, at *11 (New Jersey law, "N.J.A.C. § 12:56–7.2 expressly adopts the exemptions to the FLSA identified in 29 C.F.R. § 541 *et seq.*"); *Bachrach,* 2007 WL 3244186, at *1 (New Jersey incorporates federal overtime law into its own overtime law) (citing *Marx v. Friendly Ice Cream Corp.*, 882 A.2d 374, 379 & n. 5 (N.J. Super. Ct. App. Div. 2005)); *Reiseck v. Universal Communs. of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010) (New York Labor Law "applies the same exemptions as the FLSA"); *Arasimowicz v. All Panel Sys., LLC*, 948 F. Supp. 2d 211, 216 (D. Conn. 2013) (Connecticut law applies the same exemptions as the FLSA). Hence, Plaintiffs were exempt from overtime under New Jersey, New York, and Connecticut state laws for the same reasons they were exempt under the FLSA.

In addition, to the extent that the New Jersey Plaintiffs' state law claims are

OHSUSA:765699475.5

asserted for the period prior to May 31, 2009 (Pontilena) and June 13, 2009 (Otten), they are barred by the statute of limitations.  "Claims brought pursuant to the [New Jersey Wage and Hour Law] must be filed within two years of the date of accrual of an alleged violation." *Mitchell v. C & S Wholesale Grocers, Inc.*, No. CIV.A. 10-2354 (JLL), 2010 WL 2735655, at *2 (D.N.J. July 8, 2010) (citing N.J.S.A. § 34: 11–56a25.1).  Similarly, to the extent Rosenblatt asserts a Connecticut state law claim for the period prior to June 29, 2009, the claim is time barred because Connecticut also imposes a two-year statute of limitations.  *See Matysiak v. Shamas*, No. 3:10-CV-01841-GWC, 2015 WL 4939793, at *2 (D. Conn. Aug. 17, 2015) ("[A]n action for unpaid wages or overtime brought under the [Connecticut Minimum Wage Act] must be brought within two years after the cause of action accrues.") (citing Conn. Gen. Stat. § 52–596).

## V.    <u>CONCLUSION</u>

The undisputed evidence – based largely on Plaintiffs' own testimony – establishes that MSSB is entitled to summary judgment on Plaintiffs' FLSA and state law claims for overtime.

Dated:  October 28, 2016

By:_____ */s/ Trish Higgins*_____

Trish Higgins
ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Defendants

OHSUSA:765699475.5